UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TERRELL WILLIAMS,

*Petitioner*,

– against –

SUPERINTENDENT, GHCF,

*Respondent.*

**MEMORANDUM & ORDER**
23-cv-05595 (NCM)

**NATASHA C. MERLE**, United States District Judge:

Petitioner Terrell Williams,[1] currently incarcerated at Sing Sing Correctional Facility, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Williams was convicted of one count of second-degree murder and one count of second-degree criminal possession of a weapon after a jury trial. Through counsel, Williams states one ground for relief in the amended petition, ECF No. 15 ("Petition")[2]: the admission of an "autopsy report drafted by a non-testifying physician was contrary to and constituted

---

[1] Although the original petition lists petitioner's name as "Terrel" Williams, *see* Pet. 1, ECF No. 1, the Amended Petition and documents from petitioner's criminal trial and direct appeal indicate that petitioner's name is spelled "Terrell" Williams. *See* Am. Pet. 1, ECF No. 15; Am. Pet. Ex. 3, ECF No. 15-3; Affirmation in Opp'n to Pet. Ex. 3, ECF No. 19-3. Accordingly, the Clerk of Court is respectfully directed to amend the caption of the case as above.

[2] The Court hereinafter refers to the Amended Petition for a Writ of Habeas Corpus, ECF No. 15, as the "Petition"; respondent's Response to Order to Show Cause, ECF No. 19, pp. 23–47, as the "Opposition"; and petitioner's Memorandum of Law in Reply to the Opposition, ECF No. 21, as the "Reply."

an unreasonable application of clearly-established Supreme Court precedent." Pet. 18.[3] Petitioner seeks release from the state's custody unless he is afforded a new trial within a reasonable time. Pet. 36. For the reasons set forth below, the Petition is **DENIED**.

BACKGROUND

### I.     Underlying Offense

The government presented evidence of the following facts at trial. On September 6, 2014, at approximately 6:30 a.m., police officers Piotr Zebrowski and Jeremy Lucca were on patrol in an unmarked vehicle parked between 309 MacDougal Street and 25 Stone Avenue, also known as Mother Gaston Boulevard. Affirmation in Opp'n to Pet. Ex. 3 ("Trial Tr."), ECF No. 19-3, 314:1–315:7. While in the vehicle the officers used binoculars to observe people walking in the street. Trial Tr. 317:11–21. At about 6:45 or 6:50 a.m., Zebrowski witnessed two men arguing further down MacDougal Street and Stone Avenue. Trial Tr. 318:24–319:10. The officers observed a man in a multicolored shirt shoot the person he was arguing with. Trial Tr. 319:5–6, 320:5–17. The officers heard a "bang noise" and then observed the man who was shot "tumble" to the ground. Trial Tr. 321:1–5. The officers heard additional gunshots and witnessed the man in the multicolored shirt walk away. Trial Tr. 321:14–21. They pursued the individual. Trial Tr. 321:22–322:7.

With Zebrowski in the passenger seat, Lucca drove around 309 MacDougal Street and found Terrell Williams walking toward the intersection of MacDougal and Stone. Trial Tr. 322:2–323:6, 443:5–17. The officers testified that they observed Williams with a gun. Trial Tr. 323:6–11. Zebrowski pointed his gun outside the vehicle window and said to the man, "Police, don't move, Let me see your hands. Let me see your hands. Let me

---

[3]     Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

see your hands." Trial Tr. 324:11–15. Williams "crunched" down by a silver car, and officers heard something like metal fall to the ground. Trial Tr. 324:18–25. Williams contemporaneously stated, "I don't have anything." Trial Tr. 326:16–19. The officers secured Williams and two other men, later identified as Jamard Grace and Donnell Pickney, near the crime scene. Trial Tr. 159:25, 326:2–7, 492:3–6. Lucca and Zebrowski then looked under the car and found a silver gun. Trial Tr. 326:5–10, 448:2–7. The officers returned to the victim's body and believed that he was dead. Trial Tr. 327:16, 23; *see also* Trial Tr. 451:11–23. The victim, Damon Page, was later declared dead. Trial Tr. 59:10–14; *see also* Trial Tr. 77:9–11, 79:22–80:19, 300:1–11. The government charged Terrell Williams with Damon Page's murder and illegal possession of a firearm. Pet. 1.

## II.    Trial

At trial, the prosecution presented twelve witnesses.[4] The defense did not present any witnesses. Most relevant to the issues presented by the instant Petition are the testimonies of the responding officers—Zebrowski and Lucca—as well as the testimony of the state's forensic pathology expert, Dr. Georgievskaya.

### A. Officer Zebrowski

Zebrowski testified that he began his shift at around 7:30 p.m. on September 5, the evening before the shooting. Trial Tr. 313:22–23. He testified that he was in plain clothes in an unmarked police vehicle with his partner, officer Lucca. Trial Tr. 313:24–314:8. Zebrowski was observing foot traffic around the intersection of MacDougal Street and Stone Avenue through a set of binoculars. Trial Tr. 315:6–16, 317:8–23. At around 6:45

---

[4]    Although Donnel Pickney appeared on the state's witness list, he did not testify at trial. Trial Tr. 622:24–25. The court ruled that petitioner was not entitled to a missing witness charge because Pickney was not in the state's control. Trial Tr. 700:1–4.

a.m., Zebrowski saw two men arguing, one of whom was wearing a "multi-color[ed] shirt," and whom Zebrowski later identified in the courtroom as petitioner. Trial Tr. 318:24–319:3, 320:3–5, 327:3–8. Shortly thereafter Zebrowski witnessed the man in the multicolored shirt take out "what seem[ed] to be a gun and sho[o]t the other guy." Trial Tr. 319:5–7; *see also* Trial Tr. 320:15–17. Specifically, Zebrowski observed the man's outreached hand recoil, followed by a bang noise. Trial Tr. 320:18–321:1. Zebrowski saw the other man fall down, and testified that he saw the man in the multicolored shirt "point[] [his] hand, again[,] and again, I heard shots." Trial Tr. 321:2–18. Zebrowski then saw the shooter walking away. Trial Tr. 321:17–21.

Zebrowski testified that he and Lucca started driving toward the shooter. Trial Tr. 322:1–16. As they approached, Zebrowski saw the man "put[] the gun inside of his waistband." Trial Tr. 323:10–11. Zebrowski then drew his weapon and directed the man not to move. Trial Tr. 324:13–14. At that point, Zebrowski saw the man "stop[] by a silver car" and "crunch[] down[.]" Trial Tr. 324:18–21. Once the man crouched down, Zebrowski heard a "noise like a metal being dropped on the floor" and heard the man say, "I don't have anything." Trial Tr. 324:24–25, 326:16–19. Zebrowski then arrested the man and "secured the scene" with two other people in the area. Trial Tr. 325:3–11. Zebrowski went back and looked underneath the car and saw a silver gun. Trial Tr. 326:2–10. After Zebrowski "secured" the area, he went back to check the condition of the individual who was shot and observed that the individual "was dead." Trial Tr. 327:10–23.

### B. Officer Lucca

Officer Jeremy Lucca, Zebrowski's partner, also testified at trial. He testified consistent with Zebrowski that the two were on shift in an unmarked police vehicle near Stone and MacDougal on the morning of September 6, 2014. Trial Tr. 434:5–435:14.

While observing a group of people near the intersection through his binoculars, Lucca saw two individuals talking—one of whom was in a multi-colored shirt. Trial Tr. 437:9–17, 440:9–10. Lucca then witnessed the individual in the multi-colored shirt, "blade[] his body . . . and c[o]me out with his arm straight up." Trial Tr. 441:9–11. Then, with the man's arm extended, Officer Lucca "heard a loud bang." Trial Tr. 441:17–18. Lucca testified that he heard two more loud bangs, and each time saw the man's arm recoil. *See* Trial Tr. 441:17–21. At that point, Lucca observed the other individual stumble backwards while the man in the multi-colored shirt "stepped forward." Trial Tr. 442:3–4. Lucca testified that he heard two more loud bangs, and again, witnessed the shooter's arm recoil. *See* Trial Tr. 442:3–6.

Lucca then testified that he and Zebrowski drove their car in pursuit of the shooter. *See* Trial Tr. 442:12–444:4. While approaching the suspect in the vehicle, Lucca "observed the gun in the individual's hand." Trial Tr. 444:13–15. Then, as the officers were "pulling up . . . he's placing the gun into his waistband." Trial Tr. 444:17–18. Lucca testified consistent with Zebrowski that he observed the man in the multi-colored shirt crouch down, heard the man say that he "d[i]dn't have anything," and that while the man was crouching Lucca "heard a loud, distinct, metal clank noise." Trial Tr. 445:21–446:3. Lucca also identified petitioner in court as the man whom he and Zebrowski detained at the scene. *See* Trial Tr. 447:12–19.

### C. Dr. Georgievskaya

The prosecution sought to put Dr. Georgievskaya on as an expert witness in forensic pathology so she could testify about her conclusions on the victim's cause of death based on the notes and observations in the autopsy report. *See* Trial Tr. 64:15–66:16. However, the autopsy was performed by Dr. McCubbin, another individual from the

Office of the Chief Medical Examiner who the prosecution did not put on at trial because she was "no longer with the office." Trial Tr. 21:17–23, 64:15–22.

### i. Objection

Prior to opening statements, defense counsel objected to Dr. Georgievskaya's testimony. Trial Tr. 21:17–23:3. Specifically, defense counsel argued that Dr. Georgievskaya would base her conclusions on the findings in Dr. McCubbin's report, despite the fact that Dr. Georgievskaya was not present during the autopsy, and that that would violate defendant's right to confrontation if counsel could not "cross-examine the person whose vision or whose findings she's basing [her conclusions] on." Trial Tr. 529:14–530:7. The trial court initially ruled that Dr. Georgievskaya could not "testify to someone else's conclusion," but did not otherwise bar her from testifying. Trial Tr. 22:24–25.

Later, just before Dr. Georgievskaya testified, defense counsel again objected that Dr. Georgievskaya could not "substitute the objective findings of the autopsy for her own." Trial Tr. 580:12–21. Defense counsel acknowledged that under state case law, Dr. Georgievskaya was "entitled to [testify] based on her training" and render her opinion based on the objective portions of the report, but defense counsel nevertheless maintained his objection. Trial Tr. 580:22–23; *see* Trial Tr. 580:24–581:1 ("Now, I happen to think while I'm still objecting to [Dr. Georgievskaya basing her opinion on objective items in the autopsy report], but I still understand the cases are overruling me on that[,] I still have my objection[.]"). The trial court overruled the objection based on its conclusion that, under prevailing state case law, "autopsy reports are not testimonial," and that "[t]he fact that testimony is introduced through the testimony of a medical

6

examiner who didn't conduct the autopsy is perfectly appropriate within the meaning of all these cases." Trial Tr. 582:12–583:6.

### ii. Testimony

Testifying as an expert witness in forensic pathology, Dr. Georgievskaya confirmed that she did not perform and was not present for Damon Page's autopsy. Trial Tr. 593:15–19, 594:25–595:9, 597:8–14. The prosecution entered a redacted version of the autopsy report into evidence as a business record. *See* Trial Tr. 595:15–597:19. Dr. Georgievskaya testified that she reviewed the autopsy report and photographs taken in connection with the autopsy in advance of trial. Trial Tr. 597:24–598:3. Dr. Georgievskaya began by "describing the [gunshot] wounds just arbitrarily how doctor [McCubbin] described them in the report." Trial Tr. 599:10–11. She then testified about the victim's four gunshot wounds, including where they punctured the victim's body and their trajectories. *See* Trial Tr. 601:1–607:6. Based on her review of the autopsy report and the photographs taken in connection with the autopsy, Dr. Georgievskaya testified that the victim "died of gunshot wounds of torso with visceral injuries." Trial Tr. 607:19–20.

### D. Other Evidence

The prosecution also presented additional witness testimony and forensic evidence. For instance, another police officer, Asad Anwar, testified that he arrived at the crime scene after the shooting, where he stayed near the victim's body. Trial Tr. 74:2–22, 76:2–4. According to Anwar, the victim did not appear to be breathing. Trial Tr. 76:9–10. He testified that he observed EMS attempt, but fail, to resuscitate Page. Trial Tr. 76:13–25. Anwar testified that he accompanied EMS and the victim's body to Brookdale Hospital. Trial Tr. 77:4–8. Anwar further testified that he saw a bullet on the victim's gurney after medical personnel moved the body. Trial Tr. 78:13–25, 85:21–22, 86:6–7.

Anwar later delivered the recovered bullet to the crime scene detective. Trial Tr. 79:10–12, 21. The prosecution produced evidence of the recovered firearm, and ballistics evidence indicating that fired bullets recovered at the scene matched the profile of the weapon recovered from underneath the vehicle at the scene. Trial Tr. 238:2–13, 240:10–12, 17, 241:11–18, 246:8–9, 369:11–14, 372:24–25, 373:1, 408:6–8. The prosecution also elicited testimony that an officer had vouchered into evidence a multicolored shirt that petitioner was wearing while in his cell following his arrest, Trial Tr. 152:22–154:3, 157:20–159:10, but due to its poor condition, they were unable to perform further testing, Trial Tr. 98:23–100:9, 100:25–101:5, 102:1–15. Lastly, the prosecution produced evidence that petitioner had previously worn the multicolored shirt recovered from his cell based on content discovered on social media accounts associated with petitioner. Trial Tr. 161:3–162:25.

### E. Closing Arguments

In closing, the defense argued that the evidence did not show that Terrell Williams shot Damon Page. Trial Tr. 763:19–22, 765:11–14. Defense counsel conceded that "nobody [wa]s denying that Mr. Page was murdered. There is no question," but argued that was "not the same thing as saying Mr. Williams did this because . . . he did not do this crime." Trial Tr. 714:6–15. Defense counsel asserted that the police had many opportunities to get DNA testing on items that would prove the identity of the shooter but failed to do so merely because the officers said they witnessed the shooting. Trial Tr. 725:1–18, 731:13–23. The defense also argued that the officers' testimony didn't "fit the testimony" of Dr. Georgievskaya, *see* Trial Tr. 764:2–5, including because the officers testified that the victim was found lying on his back, but other evidence suggested that the victim "g[o]t three shots in the back," Trial Tr. 764:16–17. That is, because

Dr. Georgievskaya indicated that there was "no evidence of [bullets] bouncing around," and the police officers testified that the shooter shot the victim "at the front," the evidence didn't "fit with what the police said they saw." Trial Tr. 764:6–20.

The prosecution argued that, in totality, the evidence corroborated Zebrowski and Lucca's testimony regarding the events of the crime. Trial Tr. 793:1–10. The prosecutor asserted that there was "no dispute" from the evidence "that this was a murder . . . an intentional killing of Damon [P]age." Trial Tr. 797:12–14. He further argued that officers Zebrowski and Lucca's testimony was "self-corroborating." Trial Tr. 782:17–20. The prosecutor claimed that Dr. Georgievskaya's testimony corroborated the officers' testimony because the injuries and placement of the gun wounds were "all consistent" with Zebrowski and Lucca's account of the shooting. Trial Tr. 791:13–20. He asserted that Dr. Georgievskaya's testimony not only made the officers' testimony "possible" but "probable." Trial Tr. 790:16–18. He summarized the forensic evidence by stating that everything the officers said "matche[d] up" with the forensic evidence and argued that "you can't doubt science." Trial Tr. 791:14–20.

### F. Verdict and Sentence

On April 10, 2018, the jury reached a unanimous verdict of guilty on one count of Murder in the Second Degree (New York Penal Law § 125.25[1]) and one count of Criminal Possession of a Weapon in the Second Degree (New York Penal Law § 265.03[3]). Trial Tr. 887, 891:11–23; *see also* Affirmation in Opp'n to Pet. ("Ross Decl.") ¶ 54, ECF No. 19 pp. 1–22. Approximately three months later the Supreme Court of Kings County imposed a sentence of twenty-four years to life imprisonment on the murder count, and fifteen years of imprisonment on the weapon possession count to be followed by five-years of post-release supervision, all to run concurrently. Ross Decl. ¶¶ 6, 54.

### III.    Direct Appeal

Petitioner appealed his conviction and raised the following issues: "that the trial court erred by declining to grant defendant's request for a missing witness charge regarding Donnell Pickney"; and "that the testimony of the Medical Examiner Zhanna Georgievskaya, who had neither performed nor observed the autopsy, violated his Sixth Amendment Confrontation right." Ross Decl. ¶ 55. Petitioner also filed a supplemental brief, arguing that "the evidence of his guilt was legally insufficient and the verdict was against the weight of the evidence; that his right to due process pursuant to *Brady v. Maryland* was violated by the People's failure to turn over a surveillance video; and that the trial court improperly pressured the jury to reach a verdict." Ross Decl. ¶ 57.

The Appellate Division, Second Department affirmed petitioner's conviction, *People v. Williams*, 186 N.Y.S.3d 362 (2d Dep't 2023). Ross Decl. ¶ 59. The Appellate Division found: (1) The evidence was legally sufficient to support defendant's conviction; (2) the state sufficiently demonstrated that Pickney was not under the prosecution's control; and (3) the admission of the redacted autopsy report did not violate defendant's Confrontation Clause right because the non-opinion, unredacted portions of the report were nontestimonial. *Williams*, 186 N.Y.S. at 363–64. The court also rejected petitioner's "remaining contentions." *Id.* at 364.

Petitioner's motion for leave to appeal was denied by the New York Court of Appeals on June 30, 2023, *People v. Williams*, 40 N.Y.3d 931 (2023). Ross Decl. ¶ 61. Petitioner did not file any collateral attacks or other federal proceedings related to his convictions. *See* Pet. 2–3.

## IV.    Habeas Petition

Petitioner filed this § 2254 petition pro se on July 20, 2023. ECF No. 1. Petitioner retained counsel in January 2024, ECF Nos. 12–14, and filed an amended petition on April 1, 2024, *see* Pet. Petitioner states one ground for relief in the amended petition: the admission "of an autopsy report drafted by a non-testifying physician was contrary to" and constituted an "unreasonable application of" clearly-established Supreme Court precedent. Pet. 18. The state filed a response in opposition to the Petition. Opp'n. The Court held oral argument on the Petition on March 13, 2025.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. *Fox v. Bezio*, No. 10-cv-02986, 2011 WL 837158, at *5 (E.D.N.Y. Mar. 7, 2011) (citing 28 U.S.C. § 2254(d)). Under AEDPA, federal habeas relief is available when "a person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas relief is only available for a violation of federal law, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

AEDPA provides that an "application for a writ of habeas corpus . . . pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings," unless adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A decision on the merits is "contrary to . . . clearly established" federal law if the state court (1) arrives at a conclusion opposite to one reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Jones v. Perez*, No. 14-cv-03971, 2015 WL 5923548, at *4 (E.D.N.Y. Oct. 10, 2015) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct controlling legal principle announced by the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Id.* (citing *Williams*, 529 U.S. at 407). This deferential standard of review, known as AEDPA deference, "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

AEDPA deference applies only to federal claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Merits adjudication occurs when a state court "disposes of the claim on the merits" and "reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007). When multiple state courts consider a case, including on direct appeal, the Court reviews the last state court decision that explained its reasoning, even if a higher court reviewed the case. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("[T]he federal court should look through the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

When there has been an adjudication on the merits, AEDPA deference "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766,

773 (2010). In practice, this means that a district court may not overturn a state court's application of federal law if it is merely incorrect, but only if it is objectively "unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In other words, a district court may overturn a state court's application of federal law only if it is "so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents." *Baez v. Royce*, No. 20-cv-01669, 2024 WL 2022090, at *8 (E.D.N.Y. May 3, 2024) (quoting *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013)).

## DISCUSSION

### I.    Procedural Requirements

Before considering the merits of a habeas petition, a federal court must ensure that the petition complies with AEDPA's procedural requirements. Specifically, the Court must ensure that the Petition is timely, that petitioner has exhausted his state court remedies, and that petitioner has not waived his federal claims nor are they barred from federal review. As laid out below, petitioner meets AEDPA's procedural requirements.

#### A. Timeliness

"AEDPA imposes a one-year statute of limitations on federal habeas corpus petitions filed by prisoners[.]" *Chambers v. Lilly*, 735 F. Supp. 3d 196, 218 (E.D.N.Y. 2024) (citing § 2244(d)(1)). Petitioner filed his § 2254 petition on July 20, 2023, well within one year of denial of leave to appeal to the New York Court of Appeals, which occurred on June 30, 2023. Ross Decl. ¶ 61. The Petition is therefore timely, which respondent does not dispute.

### B. Exhaustion

Pursuant to 28 U.S.C. § 2254(b)(1)(A), a habeas petition "shall not be granted unless it appears that . . . [petitioner] has exhausted the remedies available in the courts of the State . . . ." A petitioner exhausts remedies by "(i) present[ing] the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts); and (ii) inform[ing] that court of both the factual and legal bases for the federal claim." *Diguglielmo v. Senkowski*, 42 F. App'x 492, 494 (2d Cir. 2002) (summary order). In New York, a defendant must exhaust his claims by seeking leave to appeal any denials of relief to the New York Court of Appeals. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000). This requirement affords the state system the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995).

Petitioner has exhausted his ground for relief, which was raised on direct appeal to the state's highest court. Specifically, petitioner appealed his conviction on the Confrontation Clause issue raised in this Petition and was denied relief by the New York Court of Appeals. *See* Pet. Ex. 3, ECF No. 15-3; Pet. Ex. 4, ECF No. 15-4. Petitioner therefore has exhausted his claim, which respondent, again, does not dispute. *See Chambers*, 735 F. Supp. 3d at 225 (citing *Morgan*, 204 F.3d at 369) ("In New York, a defendant must exhaust his claims not only by presenting them to the lower state courts, but also by seeking leave to appeal any denials of relief to the New York Court of Appeals.").

### C. Independent State Grounds

Lastly, petitioner's Confrontation Clause claim is preserved for purposes of habeas review. Respondent contends that petitioner waived his Confrontation Clause claim by

consenting to the admission of the autopsy report and the attendant surrogate testimony at trial insofar as it was based on "objective facts." Opp'n 33–34. Petitioner argues that trial counsel preserved the issue by objecting multiple times to the surrogate witness's testimony. Reply 6. Petitioner also argues that, because the Second Department reached the merits, his claim was therefore preserved, and the independent state grounds procedural bar does not apply. *See* Reply 9.

To bar federal habeas review, a state court's decision must rest not only on an independent procedural bar under state law, but also one that is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191–92 (2d Cir. 2007). A state procedural bar is "adequate" if it is "firmly established and regularly followed by the state in question in the specific circumstances presented in the instant case." *Id.* at 192 (citing *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006)). However, "[s]tate procedural bars are not immortal . . . they may expire because of later actions by state courts." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Specifically, "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." *Id.* Thus, a failure to object to an issue at trial or to raise an issue on direct appeal will not bar federal habeas review where "the last state court in which review could be had considered [the] constitutional claim on the merits." *Victor v. Nebraska*, 511 U.S. 1, 19 (1994).

Here, the Second Department reviewed the merits of petitioner's Confrontation Clause claim. *See Williams*, 186 N.Y.S.3d at 364 ("Contrary to the defendant's contention, admission of an autopsy report redacted to eliminate opinions did not violate his right of confrontation. As determined by the Court of Appeals in decisions binding upon this Court, the non-opinion portion of the autopsy report was nontestimonial in nature."). As

such, respondent's argument that defense counsel failed to preserve this argument by failing to properly object at trial does not preclude this Court's review. *See* Ross Decl. ¶ 56. Put differently, irrespective of whether defense counsel's objection at trial adequately apprised the trial judge of the contours of the Confrontation Clause objection, the Appellate Division's opinion on the merits of that claim renders any preservation arguments moot.[5] *See Taylor v. Kaplan*, No. 14-cv-01402, 2017 WL 1047327, at *3 (E.D.N.Y. Mar. 17, 2017) (reasoning that even where the state court would have been entitled to find a claim procedurally defaulted, "the last state court to consider" the petitioner's claim "did so on the merits" and "[b]y doing so, it removed any bar to federal-court review that might otherwise have been available").

## II.    Merits

Where the most recent "state-court decision on the merits" is not explained on the record—"[f]or instance, the decision may consist of a one-word order, such as 'affirmed' or 'denied'"—AEDPA requires the federal habeas court to "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125–26. Here, the New York Court of Appeals did not issue a written opinion in denying leave to appeal. However, the Second Department issued a written opinion considering

---

[5]    Moreover, defense counsel did in fact make a Confrontation Clause objection regarding the autopsy report and thus did not waive the issue for purposes of habeas review. *See* Trial Tr. 21:17–23:1. Even if defense counsel's objection was not entirely accurate, the trial court was certainly put on notice about the constitutional concerns of an autopsy report coming in through a surrogate witness. *Cf. Chen v. Miller*, No. 24-cv-02855, 2025 WL 83774, at *1, 4 (E.D.N.Y. Jan. 13, 2025) (finding state appellate ruling that confrontation clause issue was not preserved where defense counsel "made no objection" to the surrogate witness' testimony "at all," an independent and adequate state bar to federal habeas relief).

16

and rejecting the merits of petitioner's Confrontation Clause argument. *See Williams*, 186 N.Y.S.3d at 362; *see also* Ross Decl. ¶ 60 Where "the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," AEDPA calls for a "straightforward inquiry." *Wilson*, 584 U.S. at 125. "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

### A. Federal Law

The Court concludes that the Second Department's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Garcia v. Walsh*, 348 F. App'x 618, 619 (2d Cir. 2009) (summary order). Supreme Court precedent confirms that—at the time petitioner's appeal was decided by the Second Department—autopsy reports are testimonial, and they cannot be introduced into evidence in violation of a defendant's right of confrontation.

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The so-called Confrontation Clause "applies only to testimonial hearsay—and in that two-word phrase are two limits." *Smith v. Arizona*, 602 U.S. 779, 784 (2024). First, the Clause is confined to "testimonial statements." *Id.* Second, the Clause bars only the introduction of hearsay, i.e., out-of-court statements offered to prove the truth of the matter asserted. *Id.* at 785. Beginning with its seminal decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court has established that autopsy reports are "testimonial hearsay" to which the Confrontation Clause applies.

i. *Crawford*

In *Crawford*, the Court assessed whether an unavailable witness's prior recorded statement to police was properly admissible at a criminal trial without the defendant having an opportunity to cross-examine the witness. *Id.* at 38. The Court elucidated two key principles from its review of the historical backdrop of the Confrontation Clause and contemporary understandings of the Framers around the time of the Clause's ratification. *See id.* at 42–50. First, the "principal evil" which the Clause was intended to address was the civil-law mode of criminal procedure, specifically the "use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Court elaborated that the text of the Sixth Amendment applies, by its terms, to "witnesses against the accused," i.e., "those who bear testimony." *Id.* at 51. "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* Thus, the constitutional text reflects "an especially acute concern with a specific type of out-of-court statement"—testimonial statements. *Id.*

The Court observed that "[v]arious formulations of this core class of testimonial statements exist[.]" *Id.* For instance, "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52. Recognizing that each of the different formulations "all share[d] a common nucleus," *id.* at 52, the Court elected to "leave for another day any effort to spell out a comprehensive definition of testimonial" in light of its conclusion that the statement at issue in the case before it—

18

a recorded statement made to police officers at a police station—qualified as testimonial under any formulation, *id.* at 68.

The second principle discussed by the Court is that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54. Reevaluating its previous framework governing the admissibility of hearsay evidence, the Court concluded that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of reliability." *Id.* at 61. As the Court explained:

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id.*

Thus, the Court held that the defendant's Sixth Amendment rights were violated by permitting the admission of the witness's testimony in the absence of an opportunity to cross-examine the witness. *Id.* at 68.

### ii. *Melendez-Diaz*

The Supreme Court built upon its Confrontation Clause precedent several years later in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). There, the Court decided whether lab analysts who prepared affidavits that "report[ed] the results of forensic analysis which showed that material seized by the police and connected to the defendant

was cocaine," were witnesses subject to the defendant's right of confrontation. *Id.* at 307. The Court answered that question in the affirmative, holding that the analysts' statements "prepared specifically for use at [the] petitioner's trial—were testimony against [the] petitioner." *Id.* at 324. Accordingly, "the analysts were subject to confrontation under the Sixth Amendment." *Id.*

The Court easily concluded that the statements at issue—affidavits—fell within the "core class of testimonial statements" covered by the Clause because they were "incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 310. Specifically, the affidavits sought to prove the fact that the substance in possession of the petitioner was in fact cocaine as the prosecution claimed. *Id.* The Court reasoned that the certificates offered by the affiants were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Id.* at 310–11.

The Court expressly rejected the respondent's argument that the analysts were not subject to confrontation because "they [we]re not accusatory witnesses, in that they d[id] not directly accuse [the] petitioner of wrongdoing." *Id.* at 313. The Court reasoned that the analysts were subject to confrontation because (1) they were witnesses because they provided solemn affirmations for proving some fact; and (2) the affirmations were offered "against [the] petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine." *Id.* As the Court explained: "The text of the [Sixth] Amendment contemplates two classes of witnesses—those against the defendant and those in his favor. The prosecution must produce the former; the defendant may call the latter. Contrary to respondent's assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id.* at 313–14. By

20

way of illustration, the Court posed a hypothetical of a police officer's investigative report "describing the crime scene." *Id.* at 316. Although the report might not reflect observations of the crime or activity related to it, that report certainly could not be admitted absent an opportunity to cross-examine the officer. *Id.*

### iii. *Bullcoming*

Finally, in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court opined on whether a forensic laboratory report certifying a defendant's blood-alcohol concentration was properly admitted at trial through a surrogate witness familiar with the laboratory's procedures, but who did not participate or observe the test on the petitioner's blood sample. *Id.* at 651. Specifically, the Court answered "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Id.* at 652. The lower court had concluded that the report was properly admissible because the certifying analyst "was a mere scrivener, who simply transcribed the results generated by the gas chromatograph machine." *Id.* at 657.

The Supreme Court disagreed, noting that the analyst's certification went beyond merely transcribing the results, but certifying the procedures and methods that the analyst undertook. *Id.* at 660. The Court opined that the lower court's ruling "raise[d] red flags." *Id.* As the Court observed, "[m]ost witnesses, after all, testify to their observations of factual conditions or events." *Id.* Thus, the fact that the analyst "simply transcribed" a result generated by a machine did not remove the report from the Clause's reach. *Id.* at 659–60. For example, "[s]uppose a police report recorded an objective fact .

21

. . the address above the front door of a house or the readout of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically 'No.'" *Id.* at 660.

The Court also rejected the respondent's argument that the reports were not "adversarial" because they were "simply observations of an independent scientist[.]" *Id.* at 664. The Court explained that its precedent made clear: "[a] document created solely for an evidentiary purpose, *Melendez–Diaz* clarified, made in aid of a police investigation, ranks as testimonial[.]" *Id.* Accordingly, "the analysts who wr[o]te reports that the prosecution introduces must be made available for confrontation even if they possess the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Id.* at 661.

Together, this Supreme Court precedent clearly established—at the time petitioner's direct appeal was decided—that "forensic report[s] [are] testimonial and the Confrontation Clause requires that the defendant be afforded the opportunity to cross-examine the declarant." *Garlick v. Lee*, 1 F.4th 122, 136 (2d Cir. 2021); *see also Ganthier v. Superintendent, Green Haven Corr. Facility*, No. 23-cv-00414, 2025 WL 2452386, at *2 (E.D.N.Y. Aug. 26, 2025) (concluding that admission of autopsy report through surrogate testimony clearly violated the Confrontation Clause).

The fact that the autopsy report was "redacted to remove the absent medical examiner's conclusions" does not compel a different result. *See* Opp'n 30. The Confrontation Clause applies to testimonial hearsay. *Smith*, 602 U.S. at 784–85. Respondent—and the Second Department—suggest that because the autopsy report was redacted to remove the absent medical examiner's opinions as to cause of death, the

remaining "non-opinion" portions of the report were not testimonial and thus did not implicate the Confrontation Clause. *See* Opp'n 30; Ross Decl. ¶ 60. But the Supreme Court has rejected this position. *See Melendez-Diaz*, 557 U.S. at 314 ("[T]here is no[] third category of witnesses, helpful to the prosecution, but somehow immune from confrontation."). The autopsy report was made for the purposes of establishing certain facts in aid of a police investigation, including where the bullets struck the victim and the nature of the victim's injuries. And the report's author certified that she conducted the autopsy—and was responsible for its findings—when and where it was conducted, and in whose presence. *See* Pet. Ex. 5 ("Autopsy Report") 4, ECF No. 15-5. In other words, the report was a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" i.e., testimony. *Crawford*, 541 U.S. at 51.

Therefore, even if "objective facts" were the only information included in the report admitted into evidence, that does not alter the testimonial nature of the report. *See Bullcoming*, 564 U.S. at 660 (explaining that Supreme Court precedent makes clear that objective facts recorded in a police report cannot be admitted through non-declarant witness); *see also Garlick*, 1 F.4th at 136 (explaining that the dictates of the Confrontation Clause extend even to "forensic report[s] contain[ing] only a contemporaneous, objective account of observable facts that do[] not accuse a defendant"); *Diaz v. Miller*, No. 22-1835, 2023 WL 4363245, at *2 (2d Cir. July 6, 2023) (summary order) ("Even if the crime scene evidence contains only a contemporaneous, objective account of observable facts that does not accuse a defendant, it is testimonial and the Confrontation Clause requires that the defendant be afforded the opportunity to cross-examine the declarant."); *Ganthier*, 2025 WL 2452386, at *22 ("Respondent's distinction between opinion and

non-opinion portions of the report is one that simply does not exist under clearly established Supreme Court precedent.").[6]

Accordingly, the Appellate Division's determination that admission of the non-opinion portions of the autopsy report did not violate the Confrontation Clause amounts to an unreasonable application of federal law under AEDPA. *See Ganthier*, 2025 WL 2452386, at *17 (explaining that Supreme Court precedent made clear well before 2013 that the petitioner's "Confrontation Clause rights were violated by the introduction of [an] autopsy report—including what the Appellate Division characterized as the non-opinion portions of that report—without the production of [the declarant] for cross-examination").

\*     \*     \*

The Court does not take lightly the fact that petitioner's right to confrontation was violated at his trial. The right to confront witnesses at a criminal trial is one of our nation's bedrock constitutional guarantees. As the Supreme Court has repeatedly underscored, it protects not only individual defendants who may be wrongly accused, but the integrity of

---

[6]     Respondent argues at length that Dr. Georgievskaya's surrogate testimony was properly admissible because she offered her "expert opinion" about the victim's cause of death based on "her review of the autopsy report and the photographs of the autopsy[.]" Opp'n 34. However, in *Smith v. Arizona*, 602 U.S. 779 (2024), the Supreme Court squarely held that "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. Thus, "when an expert relays an absent lab analyst's statements as part of offering his opinion . . . and if those statements are testimonial too . . . the Confrontation Clause will bar their admission." *Id.* That is precisely what Dr. Georgievskaya did while rendering her conclusions at trial. *See, e.g.*, Trial Tr. 599:10–12 ("So I will be describing the wounds just arbitrarily how [the] doctor described them in the [autopsy] report."). However, the Court need not decide whether admission of Dr. Georgievskaya's testimony, apart from the autopsy report, violated clearly established federal law in light of the Court's conclusion discussed infra that any error in admitting the surrogate testimony was harmless.

our adversarial system of justice. The prosecution's dereliction of its duty to produce a witness who offered testimony against petitioner as required by the Constitution is particularly egregious given the unconvincing reason for the State's failure: the medical examiner who performed the autopsy was no longer employed by the State. Still, this Court must abide by AEDPA and binding precedent, requiring the Court to determine whether any error in admitting the evidence was harmless. And as set forth below, the Court concludes that the constitutional error in petitioner's case was harmless in light of the other evidence offered at trial.

### B. Harmless Error

When a federal habeas court finds error in a state court's ruling on the merits of a state prisoner's claim, the federal court cannot grant relief without determining that the error was not harmless. This requires "an actual prejudice analysis, wherein an error is harmless if it did not have a substantial and injurious effect or influence in determining the jury's verdict." *Young v. Collado*, No. 20-cv-02172, 2024 WL 3218839, at *10 (E.D.N.Y. June 28, 2024) (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)); *see also Diaz*, 2023 WL 4363245, at *1 (quoting *Perkins v. Herbert*, 596 F.3d 161, 175 (2d Cir. 2010)). Petitioner bears the burden of showing that the error was not harmless. *See Hernandez v. McIntosh*, 146 F.4th 142, 163 (2d Cir. 2025) (explaining that under *Brecht*, "the burden is on the petitioner to show harm"); *see also Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a reasonable possibility that trial error contributed to the verdict," but instead, the petitioner "must demonstrate that he suffered actual prejudice because the [error] had a substantial and injurious effect or influence in determining the jury's verdict").

In determining whether a Confrontation Clause error was harmless, the Court considers "a host of factors, including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Diaz*, 2023 WL 4363245, at *2 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). An error is harmless if it is "highly probable" that it did not contribute to the jury's verdict. *United States v. Johnson*, 117 F.4th 28, 43 (2d Cir. 2024); *see, e.g.*, *Diaz*, 2023 WL 4363245, at *3 (finding Confrontation Clause violation harmless where a damaging cross-examination of unavailable detective would have been irrelevant to corresponding issue); *United States v. McClain*, 377 F.3d 219, 222–23 (2d Cir. 2004) (finding Confrontation Clause violation harmless where there was overwhelming evidence of the defendants' guilt). In other words, "[e]rroneously admitted evidence is harmless if it was unimportant in relation to everything else the jury considered on the issue in question." *United States v. Greco*, 728 F. App'x 32, 34 (2d Cir. 2018) (summary order).

Petitioner contends that the error was not harmless because (i) intent was at issue at trial and (ii) the autopsy report was the "only proof" from which the jury could infer petitioner's intent. *See* Reply 2–3. Respondent contends that the only issue at trial was the identity of the shooter—which the autopsy report did not address—and that neither the autopsy report nor Dr. Georgievskaya's surrogate testimony "were necessary to prove defendant's intent to kill." Opp'n 41–43. The Court finds that admission of the autopsy report, although erroneous, constituted harmless error.

i. Intent Not at Issue

To begin, contrary to petitioner's contention, the core issue disputed at trial was whether petitioner was misidentified as the shooter; there was no real dispute as to the cause and manner of the victim's death. Indeed, defense counsel admitted as much in his summation: "[N]obody is denying that Mr. Page was murdered. There is no question . . . ." Trial Tr. 714:10–12; *see also Guyton v. LeFevre*, 560 F. Supp. 1237, 1246 (S.D.N.Y. 1983) ("Insofar as petitioner's defense did not, in fact, dispute the murder and in many ways admitted it was someone else, it can fairly be said that the defendant conceded the issue of intent[.]"). Put differently, "there was no genuine dispute regarding the fact that [Mr. Page's] death was a homicide." *Wright v. Duncan*, 31 F. Supp. 3d 378, 422 (N.D.N.Y. 2011). Instead, petitioner's theory of defense was that the police misidentified who shot and killed the victim.[7] *See* Trial Tr. 763:15–22. On these facts, the erroneous admission of an autopsy report and surrogate testimony offered for purposes of confirming the victim's cause of death constituted, at most, harmless error. *See e.g.*, *Ventura v. United States*, No. 18-cv-09179, 2024 WL 1929183, at \*17 (S.D.N.Y. May 1,

---

[7]    Petitioner's argument that admission of the autopsy report was not harmless because "[i]f that evidence had not been admitted, [defense] counsel would almost certainly have challenged the strength of the proof of intent[,]" Reply 12, also fails. For one, petitioner's speculation that defense counsel would have more vigorously disputed proof of intent is belied by the record, which reflects that defense counsel did not dispute the issue of intent or how the victim died even within the context of his objection to Dr. Georgievskaya's testimony and admission of the autopsy report. *See* Opp'n 39–40; *see also* Trial Tr. 584:4–7 (defense counsel stating "I don't think we even have an issue of cause of death here"). And in any event, the applicable inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless," *see Van Arsdall*, 475 U.S. at 648, not whether a different trial strategy would have had a reasonable probability of producing a different outcome. And as set forth below, petitioner fails to meet his burden of showing that a fully realized cross-examination of Dr. McCubbin would be damaging such that preclusion of such cross-examination was not harmless.

2024) (concluding that alleged erroneous admission of autopsy report "did not prejudice [the petitioner] because the fact of the murder was understandably not contested"); *Melendez v. Lempke*, No. 09-cv-04373, 2012 WL 3887093, at *15 (E.D.N.Y. Sept. 7, 2012) ("[E]ven if the admission of the autopsy report into evidence violated the Confrontation Clause, the error was harmless. The autopsy report was admitted to show that [the victim] died of complications from smoke inhalation, but the cause of death was not disputed at trial.").

Petitioner's argument that the error was not harmless because intent is an element of second-degree murder is unavailing. *See* Reply 11. Although petitioner is correct that intent was necessarily an "issue" as an element of the underlying offense, it was not in dispute given petitioner's theory of the case. *Accord Hill v. Quigley*, 784 F. App'x 16, 20 (2d Cir. 2019) (summary order) (concluding that potentially erroneous jury instruction concerning intent constituted harmless error because "intent was not at issue at trial" and the defense's theory was "not that the shooting was accidental"); *Lind v. Artuz*, No. 97-cv-03331, 2001 WL 262662, at *17 (E.D.N.Y. Mar. 15, 2001) (concluding that erroneous jury instruction was harmless where "the issue of intent was not seriously contested at trial"), *aff'd*, 23 F. App'x 98 (2d Cir. 2002) (summary order).

Petitioner's defense was that he did not shoot the victim; he did not meaningfully contest that the victim's death was caused by gunshot wounds, and he did not suggest that the shooting was accidental. And because the autopsy report and Dr. Georgievskaya's testimony were not offered to prove the shooter's identity—the crux of petitioner's defense—any error in admitting that evidence was harmless. *See Duncan*, 31 F. Supp. 3d at 422 (finding that erroneous admission of autopsy report constituted harmless error because "[t]his was not a case where the defense was arguing that the death was

accidental[,] [r]ather, the defense theory was that someone else had murdered [the victim]"); *see also Edwards v. Artus*, No. 06-cv-05995, 2009 WL 742735, at *8 (E.D.N.Y. Mar. 20, 2009) ("[A]ny conceivable error in admitting the autopsy report . . . concerning cause of death would have been utterly harmless" where the petitioner did not "suggest that [the victim] could have died from some cause other than those wounds"); *People v. Fuller*, 179 N.Y.S.3d 56, 59 (1st Dep't 2022) (concluding that potentially erroneous admission of autopsy report was harmless where "[t]he cause of the victim's death was undisputed, and the only issue was the killer's identity"); *cf. Ganthier*, 2025 WL 2452386, at *14 ("And at a murder trial . . . where the primary—and arguably only—disputed issue was the cause of [] death, and where the autopsy findings were essential to the jury's resolution of that dispute, the admission of [the] autopsy report and [] surrogate testimony about its findings and conclusions was in no way harmless.").

### ii. Other Evidence of Intent

Petitioner's argument that the admission of the autopsy report was not harmless error because it was the "only proof . . . from which the jury undoubtedly inferred that petitioner intended to cause death," is similarly unavailing. Reply 2–3. The prosecution presented evidence besides the autopsy report from which a juror could infer intent, "especially where," as here, "it was uncontested[.]" *Fuller*, 179 N.Y.S.3d at 59. For example, the jury heard testimony from one of the responding officers that they observed two men arguing at the scene. Trial Tr. 318:24–319:3. A responding officer testified that he heard five gunshots fired in total, and observed the shooter's arm recoil five times. *See* Trial Tr. 441:15–442:6. Officers further testified that after the victim tumbled backward after the first shots were fired, the shooter moved closer to the victim and fired two more shots. *See* Trial Tr. 321:2–18, 509:11–511:5. Indeed, Officer Lucca testified that he

observed the shooter three to five feet away from the victim when he fired the shots. *See* Trial Tr. 510:14–25. The responding officers' testimony was corroborated by other testimony and ballistics evidence, such as three recovered bullets—including a bullet recovered from a hospital gurney after the victim's body was moved, Trial Tr. 78:10–79:5, as well as an analysis of the alleged recovered murder weapon which contained five expended cartridge casings, *see* Trial Tr. 241:14–18, 374:6–15, 403:8–11.

On these facts, even in the absence of the autopsy report, a reasonable juror could have inferred that the shooter had intent to kill. *See Bonton v. Ercole*, No. 08-cv-00526, 2008 WL 3851938, at *8 (E.D.N.Y. Aug. 18, 2008) ("In New York, courts have consistently held that intent to kill is established when a defendant fires more than one shot at a victim at a close range."); *see also Anderson v. Lee*, No. 19-cv-04488, 2020 WL 5043906, at *2 (E.D.N.Y. Aug. 26, 2020) ("Shooting someone twice from six feet away with a .45 caliber firearm is more than sufficient to demonstrate intent to kill; indeed, shooting someone once is sufficient.") (collecting cases); *Hernandez v. Artus*, No. 09-cv-05694, 2020 WL 2769404, at *5 (E.D.N.Y. May 28, 2020) ("[T]he jury could have also inferred petitioner's murderous intent from his conduct before and after the shooting."); *People v. Lopez*, 96 A.D.3d 1621, 1622 (4th Dep't 2012) (holding that there was sufficient evidence to support a finding that the defendant acted with the intent to kill where the prosecution presented evidence that the "defendant and the victim quarreled immediately before the shooting, and that [the] defendant was only a few feet away from the victim when [the] defendant pointed a gun at him and then fired that weapon").

Petitioner's contention that without the autopsy report, "there was no other evidence about where on the body or how many times the decedent was struck by gunfire," does not compel a different conclusion. Reply 11. First, as previously discussed,

testimonial and ballistics evidence—including analysis of the recovered murder weapon and the bullets recovered at the scene—served as circumstantial evidence of the number of times the victim was struck by gunfire. *See People v. Jamison*, 616 N.Y.S.2d 735, 735 (1st Dep't 1994) ("It cannot be trivialized as mere coincidence that a bullet was promptly recovered at the scene of an alleged shooting, indeed, next to the victim's body."). Moreover, "regardless of how many shots hit" the victim, evidence that the gun was fired toward the victim five times along with the recovered bullets and discharged shell casings, "is plenty of indicia of intent." *Lee*, 2020 WL 5043906, at *2. And to the extent petitioner contends that where and how many times the victim was struck was necessary to establish cause of death, the responding officers' testimony that after they observed the shooting, they checked the victim and discovered that he was unresponsive and appeared deceased could certainly support an inference that the shooting was the cause of death. *See* Trial Tr. 355:18−356:4, 451:11−23; *see also United States v. Prince*, 445 F. App'x 419, 421 (2d Cir. 2011) (summary order) ("Although it may be ordinary practice for the prosecutor to introduce an autopsy report or testimony from a medical examiner to establish the cause of death, such evidence is not required. A jury is permitted, as it did here, to find an element of a crime proven beyond a reasonable doubt based solely on circumstantial evidence.").

### iii. *Van Arsdall* Factors

The Court also finds that application of the *Van Arsdall* factors leads to the conclusion that any error in admitting the autopsy report and Dr. Georgievskaya's testimony was harmless.

a.  Strength of the Prosecution's Case

Whether a Confrontation Clause violation has a substantial and injurious effect "depends upon a host of factors, including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Diaz*, 2023 WL 4363245, at *2 (citing *Van Arsdall*, 475 U.S. at 684). However, "the strength of the prosecution's case is probably the single most critical factor in a harmless error analysis." *Perkins*, 596 F.3d at 177; *see also United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) ("We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless."); *United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008) ("Although harmless error analysis originally focused on whether the error had affected the jury, over the years our focus has shifted from the impact of the error on the jury's analysis to an assessment of the strength of the remaining evidence of guilt.").

In petitioner's trial, "[t]he weapon, bullets, and shell casings recovered from the crime scene were exhibited at trial and admitted into evidence, corroborated by photos of the crime scene taken shortly after the shooting." *Chen*, 2025 WL 83774, at *8; *see also* Trial Tr. 226:5–242:10. Officers testified that they observed the shooting, and shortly apprehended petitioner after he fled the scene of the shooting. *See Perkins*, 596 F.3d at 178 (finding that constitutional error was harmless where the petitioner's explanation of why he fled the crime scene was "not plausible and was not supported by other evidence"). Moreover, officer testimony coupled with evidence of petitioner's social media posts tended to show that "an individual wearing the same outfit that [p]etitioner wore," shot

the victim. *Chen*, 2025 WL 83774, at *8. And the fact that the victim died shortly after the shooting was established by the testimony of officers Lucca and Zebrowski, and corroborated by the testimony of officer Anwar—who witnessed the victim at the scene of the shooting lying completely unresponsive, travelled with the victim's body to Brookdale Hospital, and later identified the body at the medical examiner's office. Trial Tr. 76:2–77:12, 79:22–80:19. "In short, this is not a case where the prosecution's evidence was weak; to the contrary, . . . eye-witness testimony tied [petitioner] to the crime[]," even without the autopsy report and surrogate testimony. *Goodman v. Collado*, No. 18-cv-02769, 2021 WL 4893676, at *6 (E.D.N.Y. Oct. 20, 2021); *accord United States v. Stukes*, 186 F. App'x 150, 151 (2d Cir. 2006) (summary order) ("Given the substantial body of evidence the government presented at trial, including the uncontroverted eyewitness testimony of a New York Police Department officer and the corroborating testimony of four other officers, [the defendant's] challenge to the sufficiency of the evidence is without merit.").

### b.  Other *Van Arsdall* Factors

Moreover, the other *Van Arsdall* factors also weigh in favor of finding that the error was harmless. First, the autopsy report had little importance to the prosecution's case as it was only briefly alluded to during the prosecution's opening and summation, and offered simply for purposes of confirming the largely undisputed issue of the cause of the victim's death. *See* Trial Tr. 64:1–6, 64:15–65:20, 793:1–11, 796:1–8; *cf. Ganthier*, 2025 WL 2452386, at *24 ("The centrality of improperly introduced evidence to a prosecution's case, including the extent to which it is featured in opening and closing arguments, can contribute to a finding that the error was not harmless."). Further, the autopsy report was cumulative as it was offered to corroborate the eyewitness testimony of the responding

police officers. *See* Trial Tr. 792:23–793:11; *see also Perkins*, 596 F.3d at 178 (finding Confrontation Clause

error harmless even where erroneously admitted eyewitness testimony "constituted significant evidence of guilt" that was "important to the prosecution's case" and which "could potentially have bolstered" properly admitted evidence because it was nonetheless "cumulative of the other testimony and evidence" tying the petitioner to the crime). To that end, no evidence in the record contradicts the material points of Dr. Georgievskaya's testimony and the autopsy report. *See id.* ("[The petitioner] introduced no testimony or evidence directly contradicting [the improperly admitted evidence] of the robbery on any material points, which also weighs in favor of finding harmless error."). Moreover, "the fact that [p]etitioner's attorney was afforded the opportunity to cross-examine every other witness," also weighs in favor of finding the error harmless. *Chen*, 2025 WL 83774, at *8.

Petitioner's cited authority illustrates the nature of the harmless error in his case. *See* Reply 4. For instance, in *Garlick*, the Second Circuit took up an appeal of a lower court's grant of habeas relief in connection with a first-degree manslaughter conviction. 1 F.4th at 125. At the underlying criminal trial, the petitioner was indicted for murder, manslaughter, and assault with a dangerous weapon stemming from a knife attack at an apartment building. *See id.* at 125–26. Over the petitioner's objection, the trial court admitted the autopsy report of the victim through the testimony of a doctor who did not prepare the report and was not involved in the autopsy. *Id.* at 126–27.

The Second Circuit held that the admission of the autopsy report constituted an unreasonable application of clearly established federal law, and that the error in admitting the report was not harmless. *See id.* at 128, 136. In its harmless error analysis,

the Court noted that the autopsy report was introduced as the State's first exhibit and that the State "heavily relied on [the report] in its opening and closing statements." *Id.* at 136. The Court further noted that the State used the report to eliminate another suspect as a potential cause of the victim's death. *Id.* The Court highlighted that the State offered the report as evidence of the petitioner's intent to cause injury and observed that "no witness testified that [the petitioner] had or used a knife during the attack, and [the petitioner] denied that he had a knife." *Id.* Thus, the Court concluded that the report was "the strongest evidence in the State's case" and was not cumulative of other evidence connecting the petitioner to the victim's death. *Id.*

The facts of petitioner's case starkly contrast the facts in *Garlick*. Here, the prosecuting district attorney alluded to the autopsy report a mere four times in his opening and summation. *See* Trial Tr. 64:1–6, 64:15–65:20, 793:1–11, 796:1–8. And the prosecution discussed the report specifically in the context of how it "corroborate[d] and [wa]s consistent with" the testimony of the police officers who responded to the shooting, i.e., the report was cumulative, Trial Tr. 65:22–66:1, or to refute defense counsel's interpretation of the autopsy report, *see* Trial Tr. 787:15–788:14. Indeed, defense counsel went to great lengths in his summation to argue that the autopsy report and Dr. Georgievskaya's testimony *supported* petitioner's defense. Namely, that the autopsy results—including the trajectory of the bullets—contradicted the responding officers' testimony and suggested that a "taller person" than petitioner shot the victim.[8] *See* Trial

---

[8]    For this reason, petitioner's argument that the issue of intent was "close[]" because the jury asked for the autopsy report during deliberations is of no moment. Reply 12. Petitioner fails to demonstrate, and the record does not reflect, that the jury sought the autopsy report during their deliberation for purposes of determining intent as opposed to, for example, considering petitioner's argument that the autopsy report didn't "fit the testimony" of the responding officers. Trial Tr. 721:13–24.

Tr. 720:4–723:1; *see also Duncan*, 31 F. Supp. 3d at 422 ("[T]he admission into evidence of the medical examiner's finding that the cause of death was homicide, while technically improper was not prejudicial to the defense. Indeed, it was consistent with their defense theory."). Moreover, far from the prosecution's "strongest evidence," the state introduced the autopsy report for the purpose of corroborating its most important evidence in the case: the eyewitness testimony of the responding officers. *See* Trial Tr. 65:22–66:1, 787:18–790:18.

*     *     *

In sum, petitioner fails to show that the error was not harmless, even if the "damaging potential of the cross-examination were fully realized[.]" *Van Arsdall*, 475 U.S. at 684. As set forth above, "[u]ltimately . . . the central question of the trial was basically one of identity." *Diaz*, 2023 WL 4363245, at *3. And a "fully realized" and "damaging" cross-examination of the unavailable medical examiner "would have been essentially irrelevant to this issue." *Id.* Accordingly, the Court concludes that the admission of the autopsy report and the attendant surrogate testimony did not have a substantial and injurious impact on the jury's verdict, and, as such, any error was harmless and the Petition must be denied. *See Perkins*, 596 F.3d at 180; *see also People v. Taveras*, 212 N.Y.S.3d 330, 333 (1st Dep't 2024) ("Although admission of the autopsy report, including the conclusions of the non-testifying examiner, violated defendant's confrontation rights, any error in admitting the autopsy report was harmless, as there was no reasonable possibility that the error contributed to the conviction. The cause of death was undisputed, and the only issue was the killer's identity."); *Mendez v. Graham*, No. 11-cv-05492, 2012 WL 6594456, at *20 (E.D.N.Y. Dec. 18, 2012) (finding error harmless where "the importance of the wrongly admitted evidence, assuming it was wrongly admitted,

36

was not great[,] [t]he prosecution did not rely on it in summation, it did not bear on an issue plainly critical to the jury's decision, and it was largely cumulative" of eyewitness testimony); *accord Diaz*, 2023 WL 4363245, at *3 ("But in light of the other evidence introduced at trial and the limited relevance of the crime scene evidence to the core dispute over competing eyewitness testimony, we cannot say that no fairminded jurist applying Supreme Court precedent could reach the First Department's" conclusion that Confrontation Clause error was harmless).

## CONCLUSION

For the reasons stated above, the Petition is **DENIED**. The Clerk of Court is respectfully directed to enter judgment and mark the case as closed.

**SO ORDERED.**

  _/s/ Natasha C. Merle_____
NATASHA C. MERLE
United States District Judge

Dated:     October 31, 2025
           Brooklyn, New York